**1:16-cv-00487-AT**

## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

*In re LEHMAN BROTHERS HOLDINGS INC., et al.*

SPANISH BROADCASTING SYSTEM, INC.

*Claimant-Appellant*

v.

LEHMAN BROTHERS HOLDINGS INC.

*Plan Administrator-Appellee*

1:16-cv-00487-AT

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
No. 08-13555 (SCC)

## BRIEF FOR PLAN ADMINISTRATOR-APPELLEE

Jacqueline Marcus
Ralph I. Miller
Denise Alvarez
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
ralph.miller@weil.com
jacqueline.marcus@weil.com
denise.alvarez@weil.com
*Attorneys for Plan Administrator-Appellee*

# RULE 8012 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 8012 of the Federal Rules of Bankruptcy Procedure, Lehman Brothers Holdings Inc., as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors,* on behalf of Lehman Commercial Paper, Inc., states as follows:

The Lehman Brothers Holdings Inc. Plan Trust owns the only share of common stock of LBHI that exists.  LBHI owns 100% of the equity interests of LCPI.

# TABLE OF CONTENTS

**Page**

Preliminary Statement....................................................................................1

Statement of Issues........................................................................................4

Standard of Review........................................................................................4

Statement of the Case....................................................................................6

I.  Statement of Facts..................................................................................6

    A.  The Credit Agreement and the Draw Request .................................6

    B.  The Claim .......................................................................................8

    C.  The Payoff Letter..........................................................................10

II.  Proceedings Below ...............................................................................12

    A.  The Objection...............................................................................12

    B.  Discovery.....................................................................................13

    C.  The Motion ..................................................................................15

Summary of the Argument...........................................................................18

Argument......................................................................................................21

I.  The Bankruptcy Court Correctly Ruled that Spanish Broadcasting Irrevocably and Unconditionally Waived Any Right to Recover Consequential Damages .................................................................21

    A.  The Damages Waiver Is Effective and Enforceable. .........................21

    B.  Nothing in the Plain Language of the Payoff Letter Terminated the Damages Waiver .......................................................................22

        1.  The Payoff Letter Terminated Obligations, Not Previously Effectuated Waivers................................................................22

        2.  The Payoff Letter Terminated Future Obligations Only. .........24

    C.  Spanish Broadcasting's Version of the Parties' Negotiations of the Payoff Letter Does Not Alter This Analysis. ................................28

        1.  The Extrinsic Evidence Relied Upon by Spanish Broadcasting Is Inadmissible……………………….........................................29

  2. Evidence of the Parties' Negotiations Confirms that the Payoff Letter Did Not Terminate the Damages Waiver……………...31

II. The Bankruptcy Court Correctly Ruled that Spanish Broadcasting Seeks Consequential Damages as a Matter of Law ...................................... 33

 A. The Bankruptcy Court Had a Sufficient Record to Determine, on Summary Judgment, Whether the Asserted Damages Were Consequential Damages. .................................................................... 33

 B. The EBITDA Damages and Swap Damages are Consequential Damages as a Matter of Law. .............................................................. 37

  1. The EBITDA Damages Are Consequential Damages that Have Been Waived by Spanish Broadcasting As a Matter of Law.... 43

  2. The Swap Damages are Consequential Damages that Have Been Waived by Spanish Broadcasting As a Matter of Law.... 50

Conclusion ............................................................................................................ 52

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*1523 Real Estate, Inc. v. E. Atl. Props., LLC*,
   No. 5955/05, 2009 WL 2340668 (N.Y. Sup. Ct. July 30, 2009) .......................23

*Abate v. Bushwick Sav. Bank*,
   138 N.Y.S.2d 140 (City Ct. 1955) ....................................................................41

*Aetna Cas. & Sur. Co. v. Kidder, Peabody & Co.*,
   676 N.Y.S.2d 559 (App. Div. 1998) .................................................................41

*AGR Fin., L.L.C. v. Ready Staffing, Inc.*,
   99 F. Supp. 2d 399 (S.D.N.Y. 2000) ................................................................26

*Am. Elec. Power Co. v. Westinghouse Elec. Corp.*,
   418 F. Supp. 435 (S.D.N.Y. 1976) ...................................................................36

*Am. List Corp. v. U.S. News & World Report, Inc.*,
   549 N.E.2d 1161 (N.Y. 1989) ..........................................................................39

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................................6

*Avalon Constr. Corp. v. Kirch Holding Co.*,
   175 N.E. 651 (N.Y. 1931) ...........................................................................40, 49

*Biotronik AG v. Connor Medsystems Ir. Ltd.*,
   11 N.E.3d 676, 679-80 (N.Y. 2014) ...........................................................42, 44

*Bond St. Knitters, Inc. v. Peninsula Nat'l Bank*,
   42 N.Y.S.2d 744 (App. Div. 1943) (*per curiam*) .............................................40

*Capitol Records, Inc. v. Naxos of Am., Inc.*,
   262 F. Supp. 2d 204 (S.D.N.Y. 2003) ..............................................................23

*Capitol Records, Inc. v. Naxos of Am., Inc.*,
   372 F.3d 471 (2d Cir. 2004) .......................................................................28, 34

*Cent. Coordinates, Inc. v. Morgan Guar. Trust Co.*,
   494 N.Y.S.2d 602 (Sup. Ct. 1985) ...................................................................41

WEIL:\95683213\10\58399.0011

*Compania Embotelladora del Pacifico, S.A. v. Pepsi Cola Co.*,
 650 F. Supp. 2d 314 (S.D.N.Y. 2009) ...............................................................42

*Coniber v. Center Point Transfer Station, Inc.*,
 27 N.Y.S.3d 763 (App. Div. 2016).............................................................50, 51

*Coniber v.Center Point Transfer Station*,
 No. 41453, 2015 WL 1471761 (N.Y. Sup. Ct. Mar. 23, 2015),
 *aff'd, Coniber*, 27 N.Y.S.3d 763 ........................................................................51

*CSX Transp., Inc. v. Emjay Envtl. Recycling, Ltd.*,
 629 F. App'x 147 (2d Cir. 2015) .......................................................................30

*Cusano v. Horipro Entm't Grp.*,
 301 F. Supp. 2d 272 (S.D.N.Y. 2004), *aff'd*, 126 F. App'x 521 (2d Cir. 2005) .33

*In re Delia*,
 No. 12 Vic. 2851 (ER), 2013 WL 5450456 (S.D.N.Y. Sept. 30, 2013)...........5, 6

*DLJ Mortg. Capital Corp. v. Fairmont Funding, Ltd.*,
 920 N.Y.S.2d 1 (App. Div. 2011).......................................................................34

*Dorsey v. Artus*,
 No. 9:09-cv-1011, 2013 WL 5463720 (N.D.N.Y. Sept. 30, 2013) ....................52

*E.ON U.S. Corp. v. PPL Corp.*,
 No. 14 Civ. 2701(KBF), 2015 WL 3867618 (S.D.N.Y. June 23, 2015)............29

*Elijah Ragira/VIP Lodging Grp., Inc. v. VIP Lodging Grp., Inc.*,
 301 S.W.3d 747 (Tex. App. 2009)......................................................................42

*Esquire Trade & Fin., Inc. v. CBQ, Inc.*,
 No. 03 CIV. 9650 (SC), 2009 WL 3756470 (S.D.N.Y. Nov. 5, 2009).............29

*First Montauk Sec. Corp. v. Menter*,
 26 F. Supp. 2d 688 (S.D.N.Y. 1998) ..................................................................33

*Genon Mid-Atl., LLC v. Stone & Webster, Inc.*,
 No. 11 CV 1299 (HB), 2012 WL 1372150, (S.D.N.Y. Apr. 18, 2012) .............35

*Gilbert Frank Corp. v. Fed. Ins. Co.*,
 520 N.E.2d 512 (N.Y. 1988)...............................................................................34

WEIL:\95683213\10\58399.0011

*Global Crossing Telecommc'ns, Inc. v. CCT Commc'ns, Inc. (In re CCT Commc'ns, Inc.)*, 464 B.R. 97 (Bankr. S.D.N.Y. 2011) ....................................40

*Golden Archer Invs., LLC v. Skynet Fin. Sys.*,
908 F. Supp. 2d 526 (S.D.N.Y. 2012) ...............................................31

*Graham v. Henderson*,
89 F.3d 75 (2d Cir. 1996) ..................................................................6

*Klos v. Polskie Linie Lotnicze*,
133 F.3d 164 (2d Cir. 1997) .............................................................32

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
595 F.3d 458 (2d Cir. 2010) .............................................................29

*In re Lehman Brothers Holdings, Inc.*,
No. 14-cv-8680 (VEC), 2015 WL 247403 (SDNY Jan. 20, 2015),
*aff'd sub nom. Ortegon v. Giddens,* No. 15-0453-bk, 2016 WL 125268
(2d Cir. Jan. 12, 2016) ........................................................................5

*Lester v. Resolution Trust Corp.*,
125 B.R. 528 (N.D. Ill. 1991) ...........................................................42

*Litton Fin. Printing Div. v. NLRB*,
501 U.S. 190 (1991)...........................................................................26

*Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*,
784 F.3d 78 (2d Cir. 2015) .........................................................28, 50

*Madeira v. Affordable Hous. Found., Inc.*,
323 F. App'x 89 (2d Cir. 2009)..........................................................29

*Morefun Co. v. Mario Badescu Skin Care Inc.*,
588 F. App'x 54 (2d Cir. 2014)..........................................................30

*JS ex rel. NS v. Attica Cent. Schools*,
386 F.3d 107 (2d Cir. 2004) ..............................................................52

*O'Grady v. BlueCrest Capital Mgmt. LLP*,
No. 15–2240–cv, 2016 WL 1459673 (2d Cir. Apr. 14, 2016) ..........30

*Ottinger v. General Motors Corp.*,
27 F. Supp. 508 (S.D.N.Y. 1939) ......................................................23

v

*PNC Bank, Nat'l Ass'n v. Wolters Kluwer Fin. Servs., Inc.*,
   73 F. Supp. 3d 358, 367 (S.D.N.Y. 2014) ....................... 6, 35, 36, 39, 44, 45, 48

*Pollack v. Crocker*,
   660 F. Supp. 1284 (S.D.N.Y. 1987) ....................................................31

*PrecisionIR Inc. v. Clepper*,
   693 F. Supp.2d 286 (S.D.N.Y. 2010) ................................................38

*Premier Corp. v. Econ. Research Analysts, Inc.*,
   578 F.2d 551 (4th Cir. 1978) ............................................................26

*Qube Films Ltd. v. Padell*,
   13-CV-8405 (AJN), 2016 WL 881128 (S.D.N.Y. Mar. 1, 2016) ....35, 47, 48, 49

*Rabin v. Parchem Trading, Inc. Profit Sharing Plan*,
   No. 13 CV 9201(VB), 2015 WL 861746 (S.D.N.Y. Jan. 30, 2015) ...........23, 28

*Reyes v. Metromedia Software, Inc.*,
   840 F. Supp. 2d 752 (S.D.N.Y. 2012) ...............................................29

*Saeco Vending, S.P.A. v. Seaga Mf'g, Inc.*,
   15-cv-3280 (AJN), 2016 WL 1659132 (S.D.N.Y. Jan. 28, 2016).....................29

*Schonfeld v. Hilliard*,
   218 F.3d 164 (2d Cir. 2000) .............................................................39, 40

*Silverman v. Cent. Equities Credit Corp. (In re 18th Ave. Realty)*,
   Case No. 03–14480(RDD), Adv. No. 07–01717(RDD), 2010 WL 1849403
   (Bankr. S.D.N.Y. May 7, 2010)...........................................................50

*SPCP Grp., LLC v. Eagle Rock Field Servs., LP*,
   No. 12 Civ. 3610 (PAC), 2013 WL 359650 (S.D.N.Y. Jan. 30, 2013)..............31

*Stanacard, LLC v. Rubard, LLC*,
   No. 12 Civ. 5176, 2016 WL 462508 (S.D.N.Y. Feb. 3, 2016)..........................32

*Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*,
   487 F.3d 89 (2d Cir. 2007) .........................................................21, 42, 43

*In re Transact, Inc.*,
   No. SACV 13-1512-MWF, 2014 WL 3888230 (C.D. Cal. Aug. 6, 2014) ........42

WEIL:\95683213\10\58399.0011

*Vision Entm't Worldwide v. Mary Jane Prods., Inc.,*
    No. 13 Civ. 4215 (AT), 2014 WL 5369776 (S.D.N.Y. Oct. 17, 2014)...........6, 7

*Vivaro Corp. v. Raza Commc'n, Inc. (In re Vivaro Corp.),*
    Case No. 12–13810 (MG), Adv. No. 12–01928 (MG), 2014 WL 486288
    (Bankr. S.D.N.Y. Feb. 6, 2014) ........................................................................39

*Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.,*
    707 F.2d 680 (2d. Cir.1983) ..............................................................................28

*Welles v. Turner Entm't Co.,*
    503 F.3d 728 (9th Cir. 2007) ......................................................................26, 27

*In re Worldcom, Inc.,*
    No. 02 Civ. 3288DLC, 2005 WL 638268 (S.D.N.Y. March 21, 2005) .............38

*YWCA v. HMC Entm't, Inc.,*
    No. 91 Civ. 7943 (KMW), 1992 WL 279361 (S.D.N.Y. Sept. 25, 1992)..........26

*Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi,*
    215 F.3d 247 (2d Cir. 2000) ..............................................................................52

*Zelazny v. Pilgrim Funding Corp.,*
    244 N.Y.S.2d 810 (Dist. Ct. 1963) ..............................................................41, 49

**Rules**

Local Bankruptcy Rule for the Southern District of New York 7056-1. .................7

**Other Authorities**

17B C.J.S. Contracts § 610 (Westlaw 2016) ............................................................26

3 Dan B. Dobbs, Dobbs Law of Remedies § 12.2(3) (2d ed. 1993)........................42

WEIL:\95683213\10\58399.0011

Appellee Lehman Brothers Holdings Inc. ("LBHI"), in its capacity as Plan Administrator (in this capacity, the "Plan Administrator") under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors* [ECF No. 22737] (the "Plan"), on behalf of Lehman Commercial Paper, Inc. ("LCPI"), by its undersigned attorneys, respectfully submits this brief in opposition to the appeal of Spanish Broadcasting System, Inc. ("Spanish Broadcasting") from the Order of the United States Bankruptcy Court of the Southern District of New York (Chapman, B.J.), dated January 6, 2016 [ECF No. 51790] (the "Order"), granting the Plan Administrator's Motion for Summary Judgment Regarding Claim 67707 Filed by Spanish Broadcasting [ECF No. 50032] (the "Motion") based upon the reasoning and rulings set forth in the Bankruptcy Court's Memorandum Decision Granting the Motion issued on December 29, 2015 [ECF No. 51730] (the "Memorandum Decision" or "Mem.").

## PRELIMINARY STATEMENT

The comprehensive and careful legal analysis in the opinion of Judge Shelley C. Chapman should be affirmed. No material facts are in dispute. All of the evidence – including evidence submitted by Spanish Broadcasting with the Claim, uncovered during discovery, and submitted by Spanish Broadcasting in opposition to the Motion – conclusively establishes that Spanish Broadcasting "irrevocably and unconditionally" waived the EBITDA Damages and the Swap

Damages that it seeks from LCPI.[1]  Spanish Broadcasting alleges that it was

damaged in excess of $41.5 million because LCPI failed to loan it $10 million the

day after LCPI commenced a voluntary case under chapter 11 of title 11 of the

United States Bankruptcy Code.  Judge Chapman correctly ruled, after substantial

discovery that included the "universe of documents" that Spanish Broadcasting

alleges demonstrates its damages, that the EBITDA Damages and the Swap

Damages constitute consequential damages barred by the Damages Waiver as a

matter of law.[2]  Indeed, even prior to discovery, the Honorable James M. Peck,

who oversaw this matter prior to his retirement from the bench, recognized that

"[t]he claims being asserted [by Spanish Broadcasting] are bloated, excessive, and

probably not allowable."  Feb. 13, 2013 Hr'g Tr. at 143:17–18 [ECF No. 34990]

(the "Sufficiency Hr'g Tr.").

The Damages Waiver expressly states that Spanish Broadcasting "hereby

irrevocably and unconditionally waives" any right to recover "any special,

exemplary, punitive, or consequential damages."[3]  Spanish Broadcasting does not

dispute that it waived any right to consequential damages when it executed the

Credit Agreement.  And yet, it now seeks such damages, amounting to four times

---

[1] All capitalized terms not previously defined that are not defined in the Preliminary Statement or Statement of Issues, are defined in the Statement of the Case.

[2] *See infra* p. 15.

[3] *See infra* p. 8-9.

WEIL:\95683213\10\58399.0011

the amount that it expected to borrow from LCPI. Those damages are the quintessential example of consequential damages under New York law. Not only are they several steps removed from the loan LCPI agreed to provide, they also arise from collateral business arrangements that are completely separate and distinct from the loan. As such, the EBITDA Damages and the Swap Damages are consequential damages barred by the Damages Waiver as a matter of law.

Spanish Broadcasting attempts to avoid this inevitable conclusion by trying to manufacture an issue of fact regarding the enforceability of the Damages Waiver. Without any relevant evidence, Spanish Broadcasting argues that the parties intended to revoke the irrevocable waiver by executing the Payoff Letter. However, glaringly absent from the Payoff Letter is any language revoking, terminating, or nullifying the Damages Waiver. Spanish Broadcasting, therefore, attempts to use emails of the parties' negotiations of the Payoff Letter to argue that the parties intended to terminate the Damages Waiver. But this extrinsic evidence is inadmissible given that the Payoff Letter is unambiguous and, in any event, none of it indicates that LCPI, or even Spanish Broadcasting, contemplated terminating the Damages Waiver. Spanish Broadcasting's after-the-fact claim that it intended to terminate the Damages Waiver is not supported by any evidence, and Spanish Broadcasting's conclusory assertions to the contrary do not create a genuine dispute of material fact.

WEIL:\95683213\10\58399.0011

Spanish Broadcasting also attempts to create an issue of fact by arguing that the characterization of its asserted damages cannot be decided on summary judgment despite Spanish Broadcasting's previous position – and Judge Peck's conclusion – that the "allowability of damages" can be determined "on a properly developed summary judgment record."[4] That evidentiary record has been developed and no material facts are in dispute. All of the evidence, including Spanish Broadcasting's own description of its damages – in both its responses to the Plan Administrator's Interrogatories and the reports of its purported experts – demonstrates that the EBITDA Damages and the Swap Damages did not flow directly from LCPI's breach but, rather, are several steps removed from LCPI's agreement to loan Spanish Broadcasting $10 million.

Accordingly, the Bankruptcy Court correctly determined, based on its review of the discovery record and extensive briefing, that there is no genuine dispute that: (1) Spanish Broadcasting waived any right to recover consequential damages; (2) such waiver remains effective and enforceable; and (3) the EBITDA Damages and the Swap Damages constitute consequential damages barred by the Damages Waiver as a matter of law.

---

[4] *See infra* p. 13-14.

WEIL:\95683213\10\58399.0011

## STATEMENT OF ISSUES

1.     Did the Bankruptcy Court correctly rule that Spanish Broadcasting irrevocably and unconditionally waived its right to recover consequential damages on account of the Credit Agreement pursuant to the Damages Waiver?

2.     Did the Bankruptcy Court correctly rule that, after the execution of the Payoff Letter, the Damages Waiver remained an enforceable and irrevocable waiver of Spanish Broadcasting's right to recover consequential damages?

3.     Did the Bankruptcy Court correctly rule that the EBITDA Damages and the Swap Damages sought by Spanish Broadcasting pursuant to the Claim are consequential damages barred by the Damages Waiver?

## STANDARD OF REVIEW

The Bankruptcy Court's decision to grant summary judgment is reviewed *de novo*, drawing factual inferences in favor of the non-moving party.  *In re Lehman Brothers Holdings, Inc.,* No. 14-cv-8680 (VEC), 2015 WL 247403, at *2 (SDNY Jan. 20, 2015), *aff'd sub nom. Ortegon v. Giddens,* No. 15-0453-bk, 2016 WL 125268 (2d Cir. Jan. 12, 2016); *In re Delia*, No. 12 Vic. 2851 (ER), 2013 WL 5450456, at *8 (S.D.N.Y. Sept. 30, 2013).  Absent evidence that there exists a genuine dispute as to a material fact, the movant is entitled to judgment as a matter of law.  *In re Delia*, 2103 WL 5450456, at *8-9.  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-

WEIL:\95683213\10\58399.0011

moving party." *Id.* (quoting *Senno v. Elmsford Union Free Sch. Dist.,* 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011)).  An issue of fact is "material" when it "matters," *i.e.*, when "it concerns facts that can affect the outcome under the applicable substantive law." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)); *see also PNC Bank, Nat'l Ass'n v. Wolters Kluwer Fin. Servs., Inc.*, 73 F. Supp. 3d 358, 367 (S.D.N.Y. 2014); *In re Delia,* 2013 WL 5450456, at *8.

Where, as here, the movant demonstrates the absence of a genuine dispute as to a material fact and the existence of a valid defense to the claims asserted, the burden shifts to the non-moving party to come forward with "admissible evidence" demonstrating there is a material issue precluding summary judgment.  *Anderson,* 477 U.S. at 249-50; *PNC Bank,* 73 F. Supp. 3d at 367; *Vision Entm't Worldwide v. Mary Jane Prods., Inc.,* No. 13 Civ. 4215 (AT), 2014 WL 5369776, at *2 (S.D.N.Y. Oct. 17, 2014) (Torres, J); *In re Delia,* 2013 WL 5450456, at *8.  The non-moving party "may not avoid summary judgment by relying solely on conclusory allegations or denials that are unsupported by factual data." *Vision Entm't Worldwide,* 2014 WL 5369776, at *2; *see also In re Delia,* 2013 WL 5450456, at *9 ("A motion for summary judgment cannot be defeated on the basis of conclusory assertions, mere denials or unsupported alternative explanations of facts").  Rather, the non-moving party must identify "specific facts" demonstrating

WEIL:\95683213\10\58399.0011

that there is a "genuine issue for trial." *Vision Entm't Worldwide,* 2014 WL

5369776, at \*2.  Where, as here, there is no genuine dispute as to the material facts

and those facts establish a valid defense for the movant, the movant is entitled to

judgment as a matter of law.

## STATEMENT OF THE CASE

### I.  STATEMENT OF FACTS

#### A.  The Credit Agreement and the Draw Request

On or about June 10, 2005, LCPI, as administrative agent and lender, and

Spanish Broadcasting, as borrower, entered into a Credit Agreement (the "Credit

Agreement"), pursuant to which LCPI and other lenders agreed collectively to

make a term loan to Spanish Broadcasting in the amount of $325 million (the

"Term Loan") on June 10, 2005.  Rule 7056-1 Stmt. ("7056-1 Statement") ¶¶ 1–2,

Ex. C §§ 2.1(a), 1.1 (definitions of "Closing Date," "Term Loan" and "Term Loan

Commitment").[5]  In addition to the Term Loan, the Credit Agreement established a

revolving credit facility under which Spanish Broadcasting had the right to request

that the lenders collectively loan an additional $25 million, with each lender

responsible for its allocated portion of the $25 million (the "Revolving Credit

Facility").  *Id.* ¶ 3, Ex. C §§ 2.4(a), 1.1 (definition of "Revolving Credit Loan").

---

[5] "Rule 7056-1 Statement" refers to the Plan Administrator's Statement of Undisputed Material
Facts (and exhibits attached thereto) in Support of Its Motion for Summary Judgment, pursuant
to Rule 7056-1 of the Local Bankruptcy Rules for the Southern District of New York, annexed to
the Plan Administrator's Notice of Motion for Summary Judgment, dated June 18, 2015 [ECF
No. 50032].

WEIL:\95683213\10\58399.0011

LCPI's credit commitment under the Revolving Credit Facility was $10 million. *See id.* ¶ 4, Ex. A, Decl. of Ralph I. Miller in Support of Mot. for Summ. J. ("Miller Declaration") Ex. 2. As administrative agent, LCPI also had the responsibility of facilitating the funding of loans from other lenders to Spanish Broadcasting under the Revolving Credit Facility. *See id.* ¶ 5, Ex. C § 2.5. Spanish Broadcasting agreed to repay the aggregate outstanding principal balance of the Term Loan by June 10, 2012, and any amounts loaned to it pursuant to the Revolving Credit Facility by June 10, 2010, each with interest at a specified rate. *Id.* ¶ 6, Ex. C §§ 1.1 (definitions of "Term Loan Maturity Date" and "Revolving Credit Termination Date"), 2.15, 2.3, and 2.8(a).

Spanish Broadcasting explicitly waived the right to seek anything other than direct damages resulting from breach of the Credit Agreement. Specifically, section 10.12 of the Credit Agreement states:

> [Spanish Broadcasting] ***hereby irrevocably and unconditionally*** . . . (e) ***waives,*** to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section[6] ***any special, exemplary, punitive or consequential damages.***

---

[6] Section 10.12 of the Credit Agreement refers to "any legal action or proceeding relating to this Agreement and the other Loan Documents to which [Spanish Broadcasting] is a party." 7056-1 Stmt. Ex. C § 10.12(a). There is no dispute this matter qualifies as "a legal action or proceeding referred to in [Section 10.12]."

WEIL:\95683213\10\58399.0011

*Id.* ¶ 9, § 10.12(e) (the "<u>Damages Waiver</u>") (emphasis added).  On June 10, 2005, the lenders under the Credit Agreement, including LCPI, loaned Spanish Broadcasting $325 million as required by the Credit Agreement.  *Id.* ¶ 10.

On October 3, 2008, just two weeks after LCPI's parent company, LBHI, commenced a voluntary case under chapter 11 of the Bankruptcy Code (*see id.* ¶ 11), Spanish Broadcasting requested an advance of the full $25 million available under the Revolving Credit Facility (the "<u>Draw Request</u>").  *See id.* ¶ 12; Miller Decl. Ex. 1.  As required by the Credit Agreement, Spanish Broadcasting sent the Notice of Borrowing to LCPI, as administrative agent, requesting that the $25 million loan be provided to Spanish Broadcasting on October 6, 2008.  *Id.* ¶ 13; Miller Decl. Ex. 1.  On October 5, 2008, LCPI commenced a voluntary case under chapter 11 of the Bankruptcy Code.  *Id.* ¶14.  As a result, LCPI did not fund its $10 million portion of the Draw Request.  *Id.* ¶ 15; Miller Decl. Ex. 2.  It is undisputed that, as administrative agent under the Credit Agreement, LCPI fulfilled its obligation to facilitate the funding of the $15 million balance due from the other lenders.  *Id.* ¶ 17.

### B.    The Claim

On November 3, 2011, Spanish Broadcasting filed proof of claim number 67707 (the "<u>Claim</u>") against LCPI seeking $55,462,228.33 in damages that it claimed to have suffered because LCPI failed to loan Spanish Broadcasting $10

WEIL:\95683213\10\58399.0011

million of the $25 million requested pursuant to the Draw Request.[7]  *Id.* ¶ 18, Ex. B.  Attached to the Claim were the Credit Agreement and a report from Capstone Advisory Group, LLC (the "Capstone Report") detailing the various components of Spanish Broadcasting's alleged damages.  *See id.* ¶ 21, Exs. C & D.

First, the Capstone Report states that Spanish Broadcasting suffered $39.6 million in damages stemming from "the expected decline in total invested capital," which the Capstone Report defines as "the market value of common equity, preferred equity, long-term debt, cash, and minority interest" (the "TIC Damages") *Id.* ¶ 22, Ex. D at 1, 2.[8]

Second, the Capstone Report states that Spanish Broadcasting suffered $9.9 million in damages (the "Swap Damages") as a result of its alleged inability to terminate an ISDA Master Agreement, dated June 28, 2005 (the "Swap"), that it had entered into with LCPI's affiliate, Lehman Brothers Special Financing Inc. ("LBSF").  *See id.* ¶ 23, Ex. D at 1, 15; Miller Decl. Ex. 3.  Although LBHI's bankruptcy filing constituted an "Event of Default" under the Swap that entitled Spanish Broadcasting to terminate the Swap, doing so would have required

---

[7] The Claim amends proof of claim number 15941, filed in an unliquidated amount against LCPI on September 18, 2009, which claim was expunged pursuant to the *Order Granting Debtors' Two Hundred Thirty-Seventh Omnibus Objection to Claims (Amended and Superseded Claims)*, dated January 26, 2012 [ECF No. 24682].

[8] As demonstrated *infra* n.12, the TIC Damages identified in the Capstone Report appear to have evolved into the EBITDA Damages that Spanish Broadcasting now seeks.

WEIL:\95683213\10\58399.0011

Spanish Broadcasting to make a termination payment to LBSF, which Spanish

Broadcasting contends would have been $6,008,991.58 as of October 3, 2008.

7056-1 Stmt. ¶ 43, Ex. D at 1, 15; Miller Decl. Ex. 3. Spanish Broadcasting

alleges that it was unable to make that payment without LCPI's $10 million portion

of the Draw Request, resulting in higher payments and additional costs to Spanish

Broadcasting when it terminated the Swap in 2010.[9] *See* 7056-1 Stmt. ¶¶ 42–43,

Ex. E; *see also* ECF Nos. 30907 ¶ 21; 34549 ¶ 15.[10]

## C. The Payoff Letter

On or about February 7, 2012, and following negotiations during which they

were represented by counsel, Spanish Broadcasting and LCPI, as administrative

agent, executed a letter terminating the Credit Agreement (the "Payoff Letter").

*See* 7056-1 Stmt. ¶ 26; Miller Decl. Ex. 4. Specifically, the Payoff Letter provides

that Spanish Broadcasting would pay in full all amounts due under the Credit

Agreement to all of the lenders. The Payoff Letter further states that "all

---

[9] The Swap was terminated pursuant to that certain confidential Hedge Amendment and
Settlement Agreement between LBSF and Spanish Broadcasting, dated as of June 17, 2010,
following an ADR proceeding pursuant to the Bankruptcy Court's *Alternative Dispute
Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts*.
[ECF No. 5207]. 7056-1 Stmt. ¶ 41. Spanish Broadcasting argues that it incurred nearly $9.9
million in additional costs under the settlement that it would not have incurred had it terminated
the Swap in October 2008. *Id.* Ex. D at 15.

[10] Additionally, the Capstone Report states that Spanish Broadcasting is entitled to recover
certain "financing and unfunded revolver fees" and the cost of replacing LCPI's $10 million
commitment of the Revolving Credit Facility. The latter portion of the Claim was withdrawn by
Spanish Broadcasting and the former was not the subject of LCPI's motion for summary
judgment.

WEIL:\95683213\10\58399.0011

obligations of [Spanish Broadcasting] and the other Loan Parties[11] thereunder and

under the other Loan Documents shall be terminated (other than contingent

obligations which expressly survive the terms of the Credit Agreement or such

other Loan Documents, including without limitation, Section 10.5 of the Credit

Agreement)."  Miller Decl. Ex. 4 § 1(a).  Additionally, section 4 of the Payoff

Letter (the "Release") contains a one-way release by Spanish Broadcasting which

states:

> *[Spanish Broadcasting]* . . . hereby unconditionally and irrevocably
> waives all claims, suits, debts, liens, losses, causes of action,
> demands, rights, damages or costs, or expenses of any kind, character
> or nature whatsoever, known or unknown, fixed or contingent, which
> any of them may have or claim to have against [LCPI] (whether in its
> capacity as an agent, lender, hedging counterparty or otherwise) or its
> agents, employees, officers, affiliates, directors, representatives,
> attorneys, successors and assigns . . . to the extent arising out of or in
> connection with the Loan Documents including, without limitation,
> any failure by [LCPI] or its affiliates to fund any Loan required to be
> funded by it under the Credit Agreement . . .  The *foregoing release*
> shall not apply to [the Claim] . . . .

*Id.* § 4 (emphasis added).  The Payoff Letter did not contain a release by LCPI of

any of its matured rights, including, but not limited to, its right to enforce the

Damages Waiver.

---

[11] The Payoff Letter provides that "[c]apitalized terms used but not defined herein shall have the meanings given such terms in the Credit Agreement."  The Credit Agreement defines Loan Parties as "[Spanish Broadcasting] and each Subsidiary of [Spanish Broadcasting] that is a party to a Loan Document."  7056-1 Stmt. Ex. C § 1.1.  The Credit Agreement defines Loan Documents as the "[First Lien Credit Agreement, as amended, supplemented, replaced or otherwise modified from time to time], the Security Documents, the Intercreditor Agreement, the Fee Letter, the Applications and the Notes."  *Id.*

WEIL:\95683213\10\58399.0011

## II.     PROCEEDINGS BELOW

### A.     The Objection

On July 10, 2012, the Plan Administrator filed an Objection to the Claim. *See Three Hundred Twenty-Eighth Omnibus Objection to Claims (No Liability Claims)* [ECF No. 29323] (the "Objection" or "Obj."). Through the Objection, the Plan Administrator sought, among other things, to disallow the TIC Damages and the Swap Damages on the basis that they are barred by the Damages Waiver. Obj. ¶ 16. Spanish Broadcasting filed a response to the Objection, dated September 13, 2012, arguing in part that the TIC Damages and the Swap Damages constitute direct and not consequential damages, and thus, that their recovery is not barred by the Damages Waiver. ECF No. 30907 ¶ 2. LBHI filed a reply to Spanish Broadcasting's response, dated January 24, 2013, demonstrating that such damages are at best, consequential damages, and that the proper measure of direct damages for a breach of contract to loan money is the incremental cost of alternate financing. ECF No. 34175 ¶ 16. Spanish Broadcasting filed a supplemental brief, dated February 11, 2013, again arguing that its damages are recoverable as direct damages, and arguing for the first time, that the Payoff Letter terminated the Damages Waiver. ECF No. 34549.

On February 13, 2013, the Court held a hearing to consider the Objection (the "Sufficiency Hearing"). During the Sufficiency Hearing, Spanish

WEIL:\95683213\10\58399.0011

Broadcasting argued that its asserted damages "are direct damages" whose allowability must "be determined at trial *or on a properly developed summary judgment record* in any event." Sufficiency Hr'g Tr. at 134:16–19 (emphasis added). After listening to Spanish Broadcasting's argument, Judge Peck, who oversaw this matter prior to his retirement from the bench, observed: "The claims being asserted here are bloated, excessive, and probably not allowable." *Id.* at 143:17–18. Nevertheless, Judge Peck decided to "[g]iv[e] the benefit of the doubt fully to Spanish Broadcasting, under a Rule 12(b)(6) standard" and held that "they will get their day in court, or we'll deal with this *on dispositive motions after discovery.*" *Id.* at 143:24–144:2 (emphasis added).

## B. Discovery

On October 14, 2014, the Bankruptcy Court entered a discovery schedule, pursuant to which the Plan Administrator and Spanish Broadcasting exchanged numerous interrogatories and document requests, many of which were related to Spanish Broadcasting's alleged damages. *See* ECF No. 46498 (as amended); Miller Decl. Ex. 5. For example, the Plan Administrator's Interrogatory No. 23 requested that Spanish Broadcasting "[d]escribe in detail the amount and computation of damages that Spanish Broadcasting is seeking in this matter." 7056-1 Stmt. ¶ 33. In its response (the "Interrogatory Response"), Spanish Broadcasting provided the following description of its damages:

WEIL:\95683213\10\58399.0011

(1)     Damages in an amount of approximately $30.3 million in impacted
        EBITDA resulting from Lehman's failure to fund the Draw;

(2)     [The Swap Damages] in an amount of approximately $17.2 million
        relating to Spanish Broadcasting's inability to terminate the Swap;

(3)     [The Fee Damages] in the amount of $273,333.33 on account of the
        fees that Spanish Broadcasting paid to Lehman for the portion of the
        Draw that Lehman failed to fund;

(4)     Interest on the foregoing; and

(5)     Spanish Broadcasting's costs, expenses and reasonable attorneys' fees
        relating to [this dispute], including, without limitation, all costs,
        expenses and fees relating to Spanish Broadcasting's testifying and
        non-testifying experts.

Miller Decl. Ex. 6 at 23–24; *see also* 7056-1 Stmt. ¶ 34.[12]  Many of the document

requests exchanged by the parties also concerned Spanish Broadcasting's alleged

damages.  The parties completed their production of documents except with

respect to two disputes, the resolution of which was unnecessary for purposes of

the Motion.  Indeed, Spanish Broadcasting confirmed to the Bankruptcy Court that

it had produced the "universe of documents that . . . demonstrates [its] damages."

Miller Decl. Ex. 7, Apr. 27, 2015 Hr'g Tr. at 14:25–15:4; 7056-1 Stmt. ¶ 35.

On April 27, 2015, Judge Chapman held a conference in an attempt to

resolve pending discovery disputes.  During that conference, the Plan

---

[12] The Interrogatory Response also identified a significant change in Spanish Broadcasting's
description of the principal portion of its damages.  *Compare* 7056-1 Stmt. Ex. B (asserting TIC
Damages) *to* Miller Decl. Ex. 6 (asserting EBITDA Damages).  Additionally, the amount of the
Swap Damages increased dramatically and without explanation.  The amount of the EBITDA
Damages and the Swap Damages sought by Spanish Broadcasting changed again when Spanish
Broadcasting submitted its purported expert reports in connection with its Reply to the Motion.
*See infra* n.14.  The discrepancies in these amounts did not affect the Motion.

Administrator sought the Bankruptcy Court's permission to file a summary

judgment motion with regard to whether the vast majority of Spanish

Broadcasting's alleged damages were recoverable given the Damages Waiver in

the Credit Agreement. Miller Decl. Ex. 7 at 19:1–25. The Plan Administrator also

requested that limited discovery regarding the negotiations of the Payoff Letter be

completed prior to LCPI filing for summary judgment. *Id.* The Bankruptcy Court

granted both requests. The parties completed discovery regarding the negotiations

of the Payoff Letter on May 11, 2015. On April 29, 2015, Spanish Broadcasting

urged the Bankruptcy Court to reconsider its decision to permit the Plan

Administrator to file for summary judgment. ECF No. 49336 at 1. The

Bankruptcy Court overruled Spanish Broadcasting's objection and held the Plan

Administrator may file a motion for summary judgment "both on the issue of

whether there is a valid waiver of consequential, special and other non-general or

direct damages" and whether the damages claimed by Spanish Broadcasting "are

within the definition of general damages or whether they are barred by the

[Damages Waiver]." May 12, 2015 Hr'g Tr. at 20–25 (statement of R. Miller)

[ECF No. 52074].

### C. The Motion

On June 18, 2015, the Plan Administrator filed the Motion [ECF No. 50032]

and supporting memorandum [ECF No. 50033] (the "<u>Mov. Mem.</u>") demonstrating

WEIL:\95683213\10\58399.0011

that (1) Spanish Broadcasting had irrevocably and unconditionally waived any right to recover consequential damages on account of the Credit Agreement, and (2) the EBITDA Damages and the Swap Damages sought by Spanish Broadcasting were consequential damages barred by the Damages Waiver as a matter of law.[13]

On July 23, 2015, Spanish Broadcasting filed its memorandum in opposition to the Motion, arguing that (1) the Payoff Letter somehow rendered the Damages Waiver ineffective or unenforceable; and (2) the EBITDA Damages and the Swap Damages are direct damages, and not consequential damages. ECF No. 50415 (the "Opp. Mem."). In support of its opposition, Spanish Broadcasting submitted, for the first time, reports of two purported experts, Mr. James Trautman and Mr. Christopher J. Kearns (the "Trautman Report" and "Kearns Report" respectively), who claimed, without any factual or legal basis, that Spanish Broadcasting's alleged damages were not consequential damages.[14] In its opposition to the Motion, Spanish Broadcasting attempted to create an issue of fact by raising a host of facts and issues that were irrelevant to the ultimate questions before the Bankruptcy Court: (1) whether Spanish Broadcasting irrevocably and unconditionally waived its right to recover consequential damages on account of

---

[13] By the time that the Plan Administrator filed the Motion, Spanish Broadcasting's claimed EBITDA Damages appears to have replaced its initial claim for TIC Damages. *See supra* n.12.

[14] The amount of the EBITDA Damages and the Swap Damages that Spanish Broadcasting alleges it seeks changed once again in the Kearns Report, amounting to a total of $41.5 million. *Compare* Miller Decl. Ex. 6 at 23-24 with Kearns Report at 11-13.

WEIL:\95683213\10\58399.0011

the Credit Agreement; (2) whether the Damages Waiver remained an irrevocable and effective bar to Spanish Broadcasting's recovery of consequential damages after the execution of the Payoff Letter; and (3) whether the EBITDA Damages and the Swap Damages asserted by Spanish Broadcasting are consequential damages as a matter of law.

On August 13, 2015, the Plan Administrator filed its Reply Memorandum of Law in further support of the Motion [ECF No. 50596] (the "Reply Mem."), further demonstrating that Spanish Broadcasting's alleged damages are consequential damages barred by the Damages Waiver as a matter of law.

On September 21, 2015, the Bankruptcy Court heard argument on the Motion. ECF No. 51214. On December 29, 2015, after considering all of the evidence before it, the Bankruptcy Court issued the Memorandum Decision granting the Motion. With regard to the three questions at issue, the Bankruptcy Court held:

(1)    "[B]y entering into the Credit Agreement containing the Damages Waiver, as of June 10, 2005, *Spanish Broadcasting waived its right to,* among other things, *seek consequential damages* on account of the Credit Agreement and its related loan documents" (Mem. at 11);

(2)    "*The Damages Waiver remains an unconditional and enforceable waiver of Spanish Broadcasting's right to bring suit for consequential damages* that was effective as of the execution of the Credit Agreement in 2005" (Mem. at 13); and

(3)    "*[T]he EBITDA Damages are consequential damages subject to the Damages Waiver*" (Mem. at 17) and "*the Swap Damages* are not

17

direct damages caused by LCPI's breach and therefore **must be considered consequential damages subject to the Damages Waiver** (Mem. at 18).

On January 7, 2016, the Bankruptcy Court entered the Order granting the Motion for the reasons described in the Memorandum Decision. On January 21, 2016, Spanish Broadcasting filed its Notice of Appeal. ECF No. 51873.

## SUMMARY OF THE ARGUMENT

The Bankruptcy Court correctly determined that Spanish Broadcasting is barred from recovering the EBITDA Damages and the Swap Damages it seeks for three reasons: (1) Spanish Broadcasting irrevocably and unconditionally waived its right to recover consequential damages when it executed the Credit Agreement in 2005; (2) the Damages Waiver remains an effective and enforceable waiver of consequential damages; and (3) the EBITDA Damages and the Swap Damages sought by Spanish Broadcasting constitute consequential damages barred by the Damages Waiver.

There is no genuine dispute as to any material fact with regard to Spanish Broadcasting's waiver of consequential damages. Spanish Broadcasting does not dispute that the irrevocable and unconditional Damages Waiver was valid and enforceable when the parties executed the Credit Agreement on or about June 10, 2005. Spanish Broadcasting's sole basis for challenging the waiver is Spanish Broadcasting's contention that the Payoff Letter, executed *seven years* after the

18

Credit Agreement and *three years* after Spanish Broadcasting filed the Claim, somehow revoked or terminated the Damages Waiver.  But, as demonstrated below, nothing in the plain language of the Payoff Letter revoked or terminated the Damages Waiver.

Spanish Broadcasting, therefore, relies on extrinsic evidence of the parties' negotiations of the Payoff Letter to argue that the parties intended the Damages Waiver to be rendered ineffective by the Payoff Letter.  As a preliminary matter, that evidence is inadmissible given that the Payoff Letter is unambiguous.  More fundamentally, Spanish Broadcasting cannot identify a single piece of evidence that LCPI intended to terminate the Damages Waiver.  At most, the evidence Spanish Broadcasting identifies supports the contention that Spanish Broadcasting secretly intended to terminate the Damages Waiver.  Even if this contention is credited, it is immaterial because Spanish Broadcasting never notified LCPI of, and LCPI never agreed to, Spanish Broadcasting's supposed intent to terminate the Damages Waiver.  Thus, the Bankruptcy Court correctly concluded that Spanish Broadcasting cannot use "the history of the negotiations of the Payoff Letter" to set aside the "plain language" of the Credit Agreement. *See* Mem. at n.10.

There also is no genuine dispute as to any material fact regarding the characterization of the EBITDA Damages and the Swap Damages as consequential damages.  As demonstrated below, these damages are not the "natural and probable

consequence" of LCPI's failure to loan Spanish Broadcasting $10 million. The natural and probable consequence of LCPI's failure to make a loan is the incremental cost to Spanish Broadcasting of alternate financing. As demonstrated by Spanish Broadcasting's purported experts, the causes of Spanish Broadcasting's alleged damages are several steps removed from LCPI's failure to loan money and resulted from collateral business arrangements. Spanish Broadcasting's conclusory assertions to the contrary, without any factual evidence, do not create a material issue of fact. Further, Spanish Broadcasting's argument that lost profits are recoverable as direct damages contradicts Second Circuit case law that lost profits are considered direct damages only when they are "precisely what the non-breaching party bargained for." *See Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 108 (2d Cir. 2007). Here, there is zero evidence that the parties ever contemplated that Spanish Broadcasting would be entitled to lost profits if LCPI failed to fund its $10 million portion of the loan commitment. Accordingly, the EBITDA Damages and the Swap Damages are consequential damages barred by the Damages Waiver as a matter of law.

20

# ARGUMENT

## I.     The Bankruptcy Court Correctly Ruled that Spanish Broadcasting Irrevocably and Unconditionally Waived Any Right to Recover Consequential Damages

### A.     The Damages Waiver Is Effective and Enforceable.

The Bankruptcy Court correctly determined that Spanish Broadcasting waived any right to recover consequential damages on account of the Credit Agreement.  *See* Mem. at 11.  Section 10.12 of the Credit Agreement expressly states:

> *[Spanish Broadcasting] hereby irrevocably and unconditionally* . . . *waives,* to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section[15] *any special, exemplary, punitive or consequential damages.*

7056-1¶ 9, § 10.12(e) (emphasis added).  Spanish Broadcasting admits that, by the plain terms of section 10.12, it waived its right to recover any special, exemplary, punitive, or consequential damages when the Credit Agreement was executed on or about June 10, 2005.  *See* Sept. 21, 2015 Hr'g Tr. at 39:6-12 [ECF No. 51214] ("Oral Argument Tr.") (conceding the waiver was valid when it was made).  That waiver was made when Spanish Broadcasting executed the Credit Agreement, and was irrevocable and unconditional by the plain language of Section 10.12.  Indeed,

---

[15] Section 10.12 of the Credit Agreement refers to "any legal action or proceeding relating to this Agreement and the other Loan Documents to which [Spanish Broadcasting] is a party."  7056-1 Stmt. Ex. C § 10.12(a).  Given that Claim 67707 arises under the Credit Agreement, this matter qualifies as "a legal action or proceeding referred to in [Section 10.12]."

WEIL:\95683213\10\58399.0011

"a waiver is an intentional abandonment or relinquishment of a known right" that "to the extent that it has been executed, cannot be expunged or recalled." *Ottinger v. General Motors Corp.,* 27 F. Supp. 508 (S.D.N.Y. 1939); *Rabin v. Parchem Trading, Inc. Profit Sharing Plan*, No. 13 CV 9201(VB), 2015 WL 861746, at *4 (S.D.N.Y. Jan. 30, 2015); *Capitol Records, Inc. v. Naxos of Am., Inc.*, 262 F. Supp. 2d 204, 211 (S.D.N.Y. 2003) (citing *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 436 N.E.2d 1265, 1270 (N.Y. 1982)), *aff'd in part, rev'd in part on other grounds by*, 372 F.3d 471 (2d Cir. 2004); *1523 Real Estate, Inc. v. E. Atl. Props., LLC*, No. 5955/05, 2009 WL 2340668, at *15 (N.Y. Sup. Ct. July 30, 2009). Thus, the Damages Waiver is a complete and effective bar to Spanish Broadcasting's ability to recover consequential damages.

## B. Nothing in the Plain Language of the Payoff Letter Terminated the Damages Waiver

### 1. The Payoff Letter Terminated Obligations, Not Previously Effectuated Waivers.

Despite Spanish Broadcasting's admission that the Damages Waiver was valid in 2005, it contends that the irrevocable and unconditional Damages Waiver was somehow revoked, unwound, or terminated by the execution of the Payoff Letter seven years later. *See id*; *see, e.g.,* SBS Br at 18.[16] Spanish Broadcasting points the Court to section 1(a) of the Payoff Letter, which states:

---

[16] Appellant's Opening Brief, dated April 11, 2016 [Dkt. 8], is referred to herein as "SBS Br."

all outstanding Loans and all other amounts owing by [Spanish Broadcasting] under the Credit Agreement (including all principal, accrued interest and fees) shall be paid in full and the Credit Agreement ***and all obligations of [Spanish Broadcasting] and the other Loan Parties thereunder and under the other Loan Documents shall be terminated*** (other than contingent obligations which expressly survive by the terms of the Credit Agreement or such other Loan Documents, including without limitation, Section 10.5 of the Credit Agreement) . . . .

Miller Decl. Ex. 4 § 1(a) (emphasis added). Spanish Broadcasting argues that the "plain terms" of section 1(a) terminated all of Spanish Broadcasting's obligations under the Credit Agreement, *including the Damages Waiver,* except for those that expressly survived. SBS Br. at 21 (emphasis added). There is no dispute that section 1(a) of the Payoff Letter terminated Spanish Broadcasting's obligations under the Credit Agreement, other than those that expressly survived. However, the Bankruptcy Court correctly ruled that the Damages Waiver is not an "obligation" under the plain meaning of the term, and thus is not covered by section 1(a). Specifically, the Bankruptcy Court concluded:

> The Damages Waiver, is not, on its face, a continuing "obligation," and Spanish Broadcasting has offered no legal support for its argument that it should be considered one under the Payoff Letter. Rather, the Damages Waiver is, by its terms, an irrevocable and unconditional relinquishment of rights that was complete and required no further action from Spanish Broadcasting upon execution of the Credit Agreement in June 2005.

Mem. at 12. Rather than provide legal support for its argument that the Damages Waiver constitutes an obligation, Spanish Broadcasting relies on the definitions of

"obligation" and "waiver" in Black's Law Dictionary.  *See* SBS Br. at 21-22.

Somehow and without explanation, Spanish Broadcasting conflates the two

definitions and concludes that a waiver is an obligation to not act in the future.  *Id.*

But, the Damages Waiver in section 10.12(e) does not state that Spanish

Broadcasting ***will forbear*** from seeking consequential damages or ***will waive*** the

right to recover consequential damages in the future.  Instead, section 10.12(e)

states that Spanish Broadcasting "***hereby irrevocably and unconditionally . . .***

***waives*** . . . any right it may have to claim or recover" consequential damages.

7056-1 Stmt. ¶ 9, § 10.12(e) (emphasis added).  Thus, Spanish Broadcasting

"hereby" relinquished – at that time – any right it may have had to claim or recover

consequential damages.  That waiver occurred in 2005 when Spanish Broadcasting

executed the Credit Agreement.  It was irrevocable and unconditional, and there

was nothing with respect to the Damages Waiver left to be performed.

### 2. The Payoff Letter Terminated Future Obligations Only.

Moreover, the Payoff Letter terminated obligations on a ***prospective*** basis

only, leaving intact the parties' existing rights and past obligations.  There is no

support for Spanish Broadcasting's suggestion to the contrary.  SBS Br. at 11-12

(arguing that where Lehman wanted a provision of the Credit Agreement to

survive, it did so with specificity).  Courts consistently hold that the termination of

a contract releases "all its parties from their respective contractual obligations,

*except obligations already fixed under the contract but as yet unsatisfied.*" *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 206 (1991) (emphasis added); *see also Welles v. Turner Entm't Co.*, 503 F.3d 728, 738 (9th Cir. 2007) ("a termination or cancellation of a contract abrogates only executory rights held under the terminated and cancelled contract" and finding that, under California law, a termination agreement terminated Orson Welles' right to royalties from *Citizen Kane*, but did not rescind copyright in *Citizen Kane* RKO received pursuant to the prior agreement); *Premier Corp. v. Econ. Research Analysts, Inc.*, 578 F.2d 551, 553–54 (4th Cir. 1978) (ruling the expiration of a brokerage contract did not discharge a broker's indemnity obligation for illegal sales it made prior to expiration, when the indemnity action was brought subsequent to expiration); *AGR Fin., L.L.C. v. Ready Staffing, Inc.*, 99 F. Supp. 2d 399, 402 (S.D.N.Y. 2000) (forum selection clause remains enforceable after termination of a contract); *YWCA v. HMC Entm't, Inc.*, No. 91 Civ. 7943 (KMW), 1992 WL 279361, at *4 (S.D.N.Y. Sept. 25, 1992) ("[p]laintiff's claims against defendant clearly arise under the contract. Even though the contract has expired, plaintiff's claims . . . involve rights arising out of the contract [and] [a]ny determination with respect to plaintiff's claims will require consideration of the contract and of the parties' respective rights pursuant to the contract."); 17B C.J.S. Contracts § 610 (Westlaw 2016) ("[T]ermination will usually have prospective operation only, and it will discharge both parties from

their contractual duty to perform promises that are still wholly executory, but will not discharge the duty to make reparation for breaches that have already occurred.").[17]  For this reason, Spanish Broadcasting's contention that the Bankruptcy Court read the word "continuing" into the meaning of the word "obligation," is unfounded.  *See* SBS Br. at 22.  The Payoff Letter did not terminate past obligations, but only those continuing into the future.[18]

Spanish Broadcasting's contention that the "[t]he Bankruptcy Court erred in failing to consider the interrelationship pf the Damages Waiver . . . and the Payoff Letter" is also incorrect.  SBS Br. at 23.  The Bankruptcy Court considered the interrelationship of the Damages Waiver and the Payoff Letter, and correctly concluded that the Damages Waiver was not an obligation terminated by the Payoff Letter as a matter of law.  *See* Mem. at 12.  Indeed, the Bankruptcy Court's decision that the Payoff Letter did not terminate the irrevocable Damages Waiver is consistent with controlling case law that a waiver is "an intentional

---

[17] In contrast, the rescission of a contract "conveys a retroactive effect," and "restore[s] the parties to their former position."  *Welles*, 503 F.3d at 738 (citing *Grant v. Aerodraulics Co.*, 204 P.2d 683, 686 (Cal. Dist. Ct. App. 1949)).  Given that Spanish Broadcasting is asserting a claim under the Credit Agreement, Spanish Broadcasting cannot claim that the same Credit Agreement, which contains the Damages Waiver, has been rescinded.

[18] The Bankruptcy Court's conclusion is consistent with Spanish Broadcasting's position that it has a claim against LCPI for failure to fund its $10 million commitment under the Revolving Credit Facility.  Had the Payoff Letter terminated prior obligations, it also would have terminated LCPI's pre-existing obligation to loan Spanish Broadcasting $10 million.  As demonstrated, *infra*, section I.C, the fact that LCPI agreed to carve the Claim out of the Release does nothing to support the merits of the Claim.

relinquishment of a known right," that "cannot be expunged or recalled," and not an obligation to act (or not act) in the future. *See*, *e.g., Capitol Records, Inc. v. Naxos of Am., Inc.*, 372 F.3d 471, 482 (2d Cir. 2004) (waiver is an "intentional relinquishment of a known right"); *Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 685 (2d. Cir.1983); *Rabin*, 2015 WL 861746, at *4. Accordingly, a waiver it is not an "obligation" under the plain meaning of the term.

Further, Spanish Broadcasting's interpretation of section 1(a) of the Payoff Letter would render the Release in section 4 of the Payoff Letter superfluous, and thus, must be rejected under basic canons of contract interpretation. The Release provides that Spanish Broadcasting "hereby unconditionally and irrevocably waives all claims, suits, debts, liens, losses, causes of action, demands, rights, damages or costs, or expenses of any kind . . . to the extent arising ***out of or in connection with the Loan Documents*** . . ." under the Credit Agreement. Miller Decl. Ex. 4 § 4 (emphasis added). Had section 1(a) terminated all pre-existing rights and obligations under the Credit Agreement, the Release would have been unnecessary because there could be no claims arising under the Credit Agreement. It is a cardinal rule that, "[i]n construing a contract, a court should . . . avoid any interpretation that would render a contractual provision without force and effect." *Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784

WEIL:\95683213\10\58399.0011

F.3d 78, 87 (2d Cir. 2015) (citation omitted).[19]  Thus, Spanish Broadcasting's

interpretation of the Payoff Letter is not supported by the express terms of the

Payoff Letter or the law.[20]

      **C.**      **Spanish Broadcasting's Version of the Parties' Negotiations of the Payoff Letter Does Not Alter This Analysis.**

              1.      The Extrinsic Evidence Relied Upon by Spanish Broadcasting Is Inadmissible.

Despite the plain language of the Payoff Letter and Spanish Broadcasting's

position that the Payoff Letter's "plain terms" terminated the Damages Waiver

(SBS Br. at 21), Spanish Broadcasting spends six pages describing the parties'

negotiations of the Payoff Letter.  *See* SBS Br. at 11-17.  Because the Payoff Letter

is clear on its face, all six pages must be disregarded.  *See* Mem. at n.11 (citing

---

[19] *See also Madeira v. Affordable Hous. Found., Inc.*, 323 F. App'x 89, 91 (2d Cir. 2009) ("New York law clearly 'disfavors interpretations that render contract provisions meaningless or superfluous.'"); *Saeco Vending, S.P.A. v. Seaga Mf'g, Inc.*, 15-cv-3280 (AJN), 2016 WL 1659132, at *5 (S.D.N.Y. Jan. 28, 2016) ("Under New York law, 'a court should avoid construing a contractual provision in a manner that renders contractual language meaningless or superfluous.'"); *E.ON U.S. Corp. v. PPL Corp.*, No. 14 Civ. 2701(KBF), 2015 WL 3867618, at *9 (S.D.N.Y. June 23, 2015) ("Courts are to construe contracts so as to give meaning to all provisions—not to render them irrelevant."); *Reyes v. Metromedia Software, Inc.* 840 F. Supp. 2d 752, 756 (S.D.N.Y. 2012) ("the cardinal rule that a contract should not be read to render any provision superfluous.").

[20] An interpretation unsupported by the contract and the law cannot be reasonable, and thus, cannot constitute a material issue of fact.  *See Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.,* 595 F.3d 458, 467 (2d Cir. 2010) ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation . . . unless each is a 'reasonable' interpretation.") (internal citation and quotation marks omitted); *Esquire Trade & Fin., Inc. v. CBQ, Inc.*, No. 03 CIV. 9650 (SC), 2009 WL 3756470, at *3 (S.D.N.Y. Nov. 5, 2009) ("A contractual provision is not rendered ambiguous simply because two interpretations are technically possible; both interpretations must also be reasonable.").  Indeed, if mere disagreement as to the interpretation of a contract precluded summary judgment, rarely, if ever, would summary judgment be granted in breach of contract cases.

28

*Hickman v. Saunders*, 645 N.Y.S.2d 49, 50 (App. Div. 1996) (explaining that,

under New York law, "if the language of [a written] agreement is free from

ambiguity, its meaning may be determined as a matter of law on the basis of the

writing alone without resort to extrinsic evidence"); *see also O'Grady v. BlueCrest*

*Capital Mgmt. LLP*, No. 15–2240–cv, 2016 WL 1459673, at *2 (2d Cir. Apr. 14,

2016) (holding that, because the agreement at issue was "unambiguous" and

"represent[ed] the 'sole and entire understanding' between the parties," a litigant

could not rely on parol evidence, "even assuming the truth of his allegations.")

(citations omitted); *CSX Transp., Inc. v. Emjay Envtl. Recycling, Ltd.*, 629 F.

App'x 147, 149 (2d Cir. 2015) (holding the district court properly declined to

consider a litigant's understanding of a contract because such understanding

"constituted parol evidence that directly contradicted the unambiguous terms

contained in each contract"); *Morefun Co. v. Mario Badescu Skin Care Inc.,* 588 F.

App'x 54, 55 (2d Cir. 2014) ("Parol evidence 'is not admissible to create an

ambiguity in a written agreement which is complete and clear and unambiguous

upon its face.'") (quoting *R/S Assocs. v. N.Y. Job Dev. Auth.,* 771 N.E.2d 240, 242

(N.Y. 2002)).[21]

---

[21] *See also SPCP Grp., LLC v. Eagle Rock Field Servs., LP*, No. 12 Civ. 3610 (PAC), 2013 WL
359650, at *6 (S.D.N.Y. Jan. 30, 2013) (parol evidence is inadmissible where a contract is clear
on its face); *Golden Archer Invs., LLC v. Skynet Fin. Sys.,* 908 F. Supp. 2d 526, 532 (S.D.N.Y.
2012) (same); *Pollack v. Crocker,* 660 F. Supp. 1284, 1288–89 (S.D.N.Y. 1987) (granting
summary judgment to plaintiff based on "clear and unambiguous" language in the contract,

### 2. Evidence of the Parties' Negotiations Confirms that the Payoff Letter Did Not Terminate the Damages Waiver.

Even the evidence of the parties' negotiations relied upon by Spanish Broadcasting does not support its interpretation of the Payoff Letter. Spanish Broadcasting claims that the parties "extensively" negotiated which provisions of the Credit Agreement would remain effective following the execution of the Payoff Letter, and yet, cannot identify any evidence showing that the parties contemplated that *all* provisions of the Credit Agreement would be terminated absent a provision stating otherwise. *See* SBS Br. at 11.[22] For this reason, Spanish Broadcasting's claim that LCPI's failure to take the position, during these negotiations, that the Damages Waiver would survive, somehow shows that the Damages Waiver was revoked, is unfounded. *See id*. at 22-23. LCPI had no reason to raise the issue because the Payoff Letter terminated Spanish Broadcasting's "obligations" only, not an irrevocable waiver of consequential damages that had been performed and completed in 2005.

Spanish Broadcasting, as the Bankruptcy Court correctly observed, seeks to alter the plain language of the Payoff Letter. *See* Mem. at 11 ("Spanish

---

holding that "[o]nly where the language of the contract is ambiguous is parol evidence admissible for contract interpretation.").

[22] Indeed, nowhere does the Payoff Letter state that all provisions (as opposed to "obligations") of the Credit Agreement would be terminated, with the exception of any provisions that expressly survive.

WEIL:\95683213\10\58399.0011

Broadcasting, by its reliance on the history of negotiations of the Payoff Letter,

essentially asks the Court to disregard the plain language of the agreement.").

Spanish Broadcasting argues that, during the parties' negotiations of the Payoff

Letter, it added the word, "expressly" to section 1(a) "to make clear that all of the

obligations under the Credit Agreement *(including Spanish Broadcasting's*

*obligation to waive its right to claim or recover consequential damages under*

*section 10.12(e) of the Credit Agreement*) would terminate, except where the

Credit Agreement expressly provided for its survival."  SBS Br. at 14 (emphasis

added).  But the record contains no evidence that this supposed intent was ever

expressed to LCPI (because it was not) and the unexpressed subjective intentions

of Spanish Broadcasting are irrelevant to establishing LCPI's reasons for accepting

the edit.  *See Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997)

("When interpreting the meaning of a contract, it is the objective intent of the

parties that controls. . . . The secret or subjective intent of the parties is

irrelevant.") (citations omitted); *Stanacard, LLC v. Rubard, LLC*, No. 12 Civ.

5176, 2016 WL 462508, at *9 (S.D.N.Y. Feb. 3, 2016) ("One of the cardinal rules

of contract construction is that the undisclosed 'intentions' of a party to a contract

cannot serve to vary the plain and unambiguous language of the agreement");

*Cusano v. Horipro Entm't Grp.*, 301 F. Supp. 2d 272, 277 (S.D.N.Y. 2004), *aff'd*,

126 F. App'x 521 (2d Cir. 2005) ("When the terms of a contract are clear, '[t]he

secret or subjective intent of the parties is irrelevant.'"); *First Montauk Sec. Corp. v. Menter*, 26 F. Supp. 2d 688, 689 (S.D.N.Y. 1998) ("[I]t is hornbook law that the uncommunicated subjective intent of a party is irrelevant in interpreting a contract.").

Finally, the fact that LCPI agreed to exclude the Claim from Spanish Broadcasting's release in the Payoff Letter does nothing to support Spanish Broadcasting's contention that the Damages Waiver was somehow rendered ineffective. *Id*. at 17-18, 22. Spanish Broadcasting essentially argues that LCPI waived its rights under the Damages Waiver by carving the Claim out of the Release. The Release in section 4 of the Payoff Letter states that Spanish Broadcasting:

> hereby unconditionally and irrevocably waives all claims, suits, debts, liens, losses, causes of action, demands, rights, damages or costs, or expenses of any kind… arising out of or in connection with the Loan Documents including, without limitation, any failure by [LCPI] or its affiliates to fund any Loan required to be funded by it under the Credit Agreement . . . The ***foregoing release*** shall not apply to [the Claim]…

Miller Decl. Ex. 4 §4 (emphasis added). Glaringly absent from the Release is any agreement that Spanish Broadcasting's Claim was meritorious or any indication that LCPI waived its rights under the Damages Waiver. And, to establish waiver under New York law, there must be "proof of an 'intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it.'" *Capitol Records*, 372 F.3d at 482; *see also Gilbert Frank Corp. v. Fed. Ins.*

*Co.*, 520 N.E.2d 512, 514 (N.Y. 1988) ("Waiver is an intentional relinquishment of a known right and should not be lightly presumed."); *DLJ Mortg. Capital Corp. v. Fairmont Funding, Ltd.*, 920 N.Y.S.2d 1, 2 (App. Div. 2011) ("Waiver requires a 'clear manifestation of an intent by a party to relinquish a known right.'"). None of the evidence shows that LCPI intentionally relinquished its rights under the Damages Waiver. Rather, the Release simply reflects the parties' agreement that Spanish Broadcasting may continue to pursue its Claim. Accordingly, the Payoff Letter and the negotiations thereof demonstrate that that the parties never intended to revoke the irrevocable Damages Waiver as a matter of law.[23]

## II. THE BANKRUPTCY COURT CORRECTLY RULED THAT SPANISH BROADCASTING SEEKS CONSEQUENTIAL DAMAGES AS A MATTER OF LAW

### A. The Bankruptcy Court Had a Sufficient Record to Determine, on Summary Judgment, Whether the Asserted Damages Were Consequential Damages.

The Bankruptcy Court correctly concluded that it had a sufficient record to determine that Spanish Broadcasting's asserted damages are consequential damages as a matter of law. *See* Mem. at 13-14 (citing *PNC Bank,* 73 F. Supp. at 358). "Courts in this District have often determined, at the summary judgment stage, whether damages claims are general or consequential." *PNC Bank,* 73 F.

---

[23] Indeed, given that the Payoff Letter was an accommodation by LCPI as agent bank acting on behalf of all lenders under the Credit Agreement, it would be nonsensical to believe that LCPI would willingly allow Spanish Broadcasting's waiver of such damages to be vitiated without any discussion or exchange of additional consideration.

WEIL:\95683213\10\58399.0011

Supp. 3d at 372; *see also Qube Films Ltd. v. Padell*, 13-CV-8405 (AJN), 2016 WL 881128 (S.D.N.Y. Mar. 1, 2016) (holding, on summary judgment, that out-of-pocket expenses incurred by a production company that was unable to find alternate financing for the production of a movie after defendants allegedly breached an escrow agreement to provide financing for the movie, constituted consequential damages barred by a damages waiver); *Genon Mid-Atl., LLC v. Stone & Webster, Inc.*, No. 11 CV 1299 (HB), 2012 WL 1372150, at *10 (S.D.N.Y. Apr. 18, 2012) (granting partial summary judgment, finding that damages for loss of bonuses are barred by the consequential damages waiver in purchase orders for wastewater treatment equipment, ancillary engineering, and start-up services).

The cases cited by Spanish Broadcasting do not refute the well-established principle that damages may be classified as direct or consequential damages on summary judgment. *See* SBS Br. at 20, 24; *see also PNC Bank,* 73 F. Supp. 3d at 372-73 (rejecting *Am. Elec. Power Co. v. Westinghouse Elec. Corp*., 418 F. Supp. 435 (S.D.N.Y. 1976), holding that "[n]ot all claimed damages require factual discovery to determine whether they are direct or consequential" and "there has been ample discovery in this case to allow the Court to classify the categories of damages at issue"). Indeed, even Spanish Broadcasting previously recognized that the court may determine, on summary judgment, whether its alleged damages are

recoverable. *See* Sufficiency Hr'g Tr. at 134:16–19 (Spanish Broadcasting's

counsel stating that the allowability of damages must "be determined at trial *or on*

*a properly developed summary judgment record* in any event."). Judge Peck

agreed with this assessment. *See* Sufficiency Hr'g Tr. at 143:24-144:2 (ruling that

Spanish Broadcasting "will get [its] day in court, or we'll deal with this *on*

*dispositive motions after discovery*.") (emphasis added).

Furthermore, there has been ample discovery in this matter and the material

facts are not in dispute. The Plan Administrator does not dispute that LCPI

breached the Credit Agreement by failing to fund $10 million of the Revolving

Credit Facility. The Plan Administrator does not dispute that the Credit Agreement

provides that the funds requested would be used for Spanish Broadcasting's

"working capital purposes, capital needs and general corporate purposes," 7056-1

Statement, Ex. C §4.16(b), and that Spanish Broadcasting was unable to use the

requested funds for those purposes. And, for purposes of its motion for summary

judgment, the Plan Administrator does not dispute that Spanish Broadcasting

allegedly suffered over $41 million in damages of some kind because LCPI failed

to fund its $10 million commitment under the $25 million Revolving Credit

Facility.[24]

---

[24] As recognized by Judge Peck, it would be extraordinarily difficult for Spanish Broadcasting to
establish causation and the Plan Administrator reserves all of its rights to challenge causation, as
well as the amount of the asserted damages. *See* Sufficiency Hr'g Tr. at 134:17-18 ("The claims

Moreover, the Bankruptcy Court had before it all of the evidence gathered over several years, including: (1) the Claim; (2) the Capstone Report attached to the Claim; (3) Spanish Broadcasting's description of damages in its Interrogatory Response; (4) the reports submitted by Spanish Broadcasting's two additional purported experts, Mr. James Trautman and Mr. Christopher K. Kearns; and (5) all of the documents produced in discovery. Indeed, Spanish Broadcasting confirmed that it had produced "the universe of documents" relevant to its claim for damages. Miller Decl. Ex. 7, Apr. 27, 2015 Hr'g Tr. at 14:25–15:4; 7056-1 Stmt. ¶ 35. Notably, Spanish Broadcasting did not identify any specific discovery that it felt was needed before the Motion would be ripe for consideration. The Bankruptcy Court correctly concluded that all of this evidence, and the applicable case law, demonstrate that the damages alleged by Spanish Broadcasting are consequential damages as a matter of law.[25]

---

being asserted here are bloated, excessive, and probably not allowable."); Mov. Mem. n.15 (reserving right "to contest on alternative grounds the amount and recoverability of the EBITDA Damages and the Swap Damages, including, but not limited to, causation."). However, for purposes of the Motion only, the Plan Administrator did not challenge the causes and amounts of Spanish Broadcasting's asserted losses.

[25] The cases cited by Spanish Broadcasting for the proposition that "fact-intensive inquiries are generally not ripe for summary judgment" support the Bankruptcy Court's decision to resolve this matter on summary judgment. SBS Br. at 20. In *PrecisionIR Inc. v. Clepper,* 693 F. Supp.2d 286, 298 (S.D.N.Y. 2010), the court concluded, on summary judgment, that the anti-competition provisions in a contract were both clear and enforceable, but denied summary judgment to defendants because (1) there were factual issues as to whether defendants actually breached the contract; and (2) it was clear that the plaintiff had suffered some injury because of the defendants' actions. Here, there are no disputes of material fact because (1) the Plan Administrator does not dispute that LCPI breached the Credit Agreement; and (2) the Plan

WEIL:\95683213\10\58399.0011

Despite the undisputed factual evidence, Spanish Broadcasting contends that "[b]ecause the question of whether [its asserted damages] are direct or consequential remains a disputed issue of material fact, the Bankruptcy Court erred by categorizing, on summary judgment, Spanish Broadcasting's damages as consequential damages." SBS Br. at 24. Spanish Broadcasting is incorrect. Whether or not its alleged damages are direct or consequential is not a question of fact, but rather, a question of law. *See* Oral Argument Tr. at 25:11-20 (Judge Chapman stating that whether damages are direct or consequential is a "legal determination"); *see also PNC Bank*, 73 F. Supp. 3d at 372 (holding that "whether damages claims are general or consequential" is not a question of fact and is often decided on summary judgment). Accordingly, the Bankruptcy Court correctly determined, on summary judgment, that Spanish Broadcasting's asserted damages are consequential damages as a matter of law.

### B.  The EBITDA Damages and Swap Damages are Consequential Damages as a Matter of Law.

The Bankruptcy Court correctly held that the EBITDA Damages and the Swap Damages sought by Spanish Broadcasting are consequential damages barred

---

Administrator does not dispute, for purposes of the Motion, that Spanish Broadcasting allegedly suffered the EBITDA Damages and Swap Damages that it alleges. Further, the *PrecisionIR* court confirmed that whether a contract provision is clear and enforceable can be determined on summary judgment. Indeed, the court *In re Worldcom, Inc.,* No. 02 Civ. 3288DLC, 2005 WL 638268 (S.D.N.Y. March 21, 2005), also cited by Spanish Broadcasting, recognized that, "with a properly supported motion it is conceivable that summary judgment could be granted." *Id.* at *11.

by the Damages Waiver. Under New York law, which governs the Credit

Agreement,[26] general or direct damages represent "the value of the very

performance promised." *Schonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000).

As such, they constitute the "natural and probable consequence" of the breach that

is being compensated. *See also Am. List Corp. v. U.S. News & World Report, Inc.*,

549 N.E.2d 1161, 1164 (N.Y. 1989) (money a defendant undertook to pay under a

contract constitute general damages that are the "natural and probable consequence

of the breach"); *Vivaro Corp. v. Raza Commc'n, Inc. (In re Vivaro Corp.)*, Case

No. 12–13810 (MG), Adv. No. 12–01928 (MG), 2014 WL 486288, at *3 (Bankr.

S.D.N.Y. Feb. 6, 2014) ("General damages flow naturally and probably from the

breach, while consequential damages flow from the benefits that performance

would have produced.") (internal quotation marks omitted). By contrast,

consequential damages do not "flow naturally and probably from the breach," but

rather, "compensate a plaintiff for additional losses (other than the value of the

promised performance) that are incurred as a result of the defendant's breach."

*Global Crossing Telecommc'ns, Inc. v. CCT Commc'ns, Inc. (In re CCT*

*Commc'ns, Inc.),* 464 B.R. 97, 117 (Bankr. S.D.N.Y. 2011) (quoting *Schonfeld*,

217 F.3d at 176).

---

[26] *See* 7056-1 Stmt. Ex. C § 10.11 (stating the Credit Agreement and the rights and obligations of
the parties thereunder shall be "governed by, and construed and interpreted in accordance with,
the law of the State of New York.").

WEIL:\95683213\10\58399.0011

The natural and probable consequence of LCPI's failure to loan Spanish Broadcasting the $10 million portion of the Draw Request simply is that Spanish Broadcasting was temporarily deprived of a fixed sum of money at an agreed-upon rate. Spanish Broadcasting's direct damages, if any, would be quantified by the increased interest rate it would have to pay a third party to borrow that $10 million. Indeed, in cases where a party fails to loan money, the incremental cost of that replacement loan, if proven, is recoverable as direct damages. *See Avalon Constr. Corp. v. Kirch Holding Co.*, 175 N.E. 651, 652–53 (N.Y. 1931) ("[t]he utmost liability of a person who breaches his contract to loan money, in the absence of notice of special circumstances, is for the increased interest the other person was obliged to pay" ) (quoting 1 J.G. Sutherland, Law of Damages §76 (4th ed. 1916)); *Bond St. Knitters, Inc. v. Peninsula Nat'l Bank*, 42 N.Y.S.2d 744, 744 (App. Div. 1943) (*per curiam*) ("The law is well settled that upon a breach of contract to loan money the recovery is only nominal unless special damage is shown"); *cf. Cent. Coordinates, Inc. v. Morgan Guar. Trust Co.*, 494 N.Y.S.2d 602, 604 (Sup. Ct. 1985) (under New York UCC, "[a] bank's failure to transfer funds . . . can result in direct or general damages (*e.g.* the loss of the funds themselves, the interest thereon and any fee paid for the failed transfer); or consequential or special damages," such as lost profits); *Abate v. Bushwick Sav. Bank*, 138 N.Y.S.2d 140, 144 (City Ct. 1955) (granting summary judgment for the defendant-bank where

plaintiff alleged bank failed to turn over deposited funds because the asserted

damages – for the down-payment made on certain property and legal fees incurred

in a real estate matter – constitute consequential damages as a matter of law).  Any

secondary costs or damages – such as lost profits or losses on collateral business

arrangements – constitute special or consequential damages under New York

law.[27]  *See e.g.*, *Zelazny v. Pilgrim Funding Corp.*, 244 N.Y.S.2d 810, 816 (Dist.

Ct. 1963) (holding "special damages which an inability to obtain the money under

the peculiar circumstances of his case has actually caused [the plaintiff]" are

recoverable as consequential damages").[28]

Lost profits are recoverable as direct damages *only* under limited

circumstances – when those lost profits flow directly from the contract itself and

thus are "precisely what the non-breaching party bargained for."  *Tractebel Energy*

---

[27] New York courts use the terms "special" and "consequential" interchangeably.  *See, e.g.*, *Aetna Cas. & Sur. Co. v. Kidder, Peabody & Co.*, 676 N.Y.S.2d 559, 563-64 (App. Div. 1998) ("Under New York law, compensatory damages are either general (direct) damages or special (consequential) damages such as a third-party's lost profits.") (internal quotation marks omitted).

[28] It is the longstanding and widely-accepted law of both New York and other jurisdictions that the measure of direct damages where a party breaches an obligation to lend money is limited to the difference between the contract rate and the rate of interest which the borrower, because of the breach, must pay to obtain the money.  *See, e.g.*, *In re Transact, Inc.*, No. SACV 13-1512-MWF, 2014 WL 3888230, at *21–22 (C.D. Cal. Aug. 6, 2014) ("in a breach of a contract to lend money, the proper measure of damages is the cost of obtaining alternative financing" and a borrower may recover consequential damages "so far as the defendant had reason to foresee such injury when the contract was made.") (quoting 11-59 Corbin on Contracts § 59.3 (rev. ed. 2014)); *Lester v. Resolution Trust Corp.*, 125 B.R. 528, 532 (N.D. Ill. 1991).  In contrast, lost profits and other expenses constitute consequential damages.  *See, e.g.*, *Transact, Inc.*, 2014 WL 3888230, at *21–22; *Resolution Trust*, 125 B.R. at 532; *Elijah Ragira/VIP Lodging Grp., Inc. v. VIP Lodging Grp., Inc.*, 301 S.W.3d 747, 756 (Tex. App. 2009).

*Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109-10 (2d Cir. 2007);

*Biotronik AG v. Connor Medsystems Ir. Ltd.*, 11 N.E.3d 676, 679-80 (N.Y. 2014);

*see also Compania Embotelladora del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F.

Supp. 2d 314, 322 (S.D.N.Y. 2009) (holding that lost profits are properly

characterized as consequential damages "when, as a result of the breach, the non-

breaching party suffers loss or profits on collateral business relationships")

(internal citation and quotation marks omitted); 3 Dan B. Dobbs, Dobbs Law of

Remedies § 12.2(3) (2d ed. 1993) ("The clear case of damages truly based on lost

profits that also count as consequential damages is the case of lost operating profits

of a business.").

Even the cases relied upon by Spanish Broadcasting confirm that the

EBITDA Damages and the Swap Damages are consequential damages barred by

the Damages Waiver.  For example, in *Tractebel Energy Marketing, Inc. v. AEP

Power Marketing, Inc.*, the Second Circuit held that plaintiff's "claim for lost

profits" was for direct damages *only* because the parties' contract expressly stated

that the non-defaulting party was entitled to damages equal to "the present value of

the economic loss (exclusive of [c]osts) resulting from the termination of the

[a]greement." *Tractebel*, 487 F.3d at 108, n. 19.  Thus, the contract at issue

expressly provided that lost profits were recoverable.  As such, lost profits were

"the direct and immediate fruits of the contract" and "precisely what the non-

breaching party bargained for." *See Tractabel*, 487 F.3d at 109-10 & n. 20.  On the

other hand, the Second Circuit also held that profits constitute consequential

damages when, as here,

> as a result of the breach, the non-breaching party suffers ***loss of
> profits on collateral business arrangements.***  In the typical case, the
> ability of the non-breaching party to operate his business, and thereby
> generate profits on collateral transactions, is contingent on the
> performance of the primary contract.  When the breaching party does
> not perform, the non-breaching party's business is in some way
> hindered, and the profits from potential collateral exchanges are 'lost.'

*Id.* at 109 (emphasis added).  Likewise, in *Biotronik AG v. Connor Medsystems Ir.*

*Ltd.,* also relied upon by Spanish Broadcasting, the New York Court of Appeals

held that lost resale profits were recoverable as direct damages because they were

contemplated under the contract.  The plaintiff in *Biotron*ik had contracted to

purchase stents from the defendant.  The lost profits sought by the plaintiff

"flow[ed] directly from the pricing formula" established for the stents in the

parties' agreement.  *Biotronik*, 11 N.E.3d at 682.  As the Court recognized in *PNC*

*Bank*, the plaintiff in *Biotronik* "had paid the defendant for a product at a price

calculated as a percentage of plaintiff's net sales of the product . . . ."  *PNC Bank,*

73 F. Supp. 3d at 373 (describing *Biotronik*).  Thus, the contract at issue in

*Biotronik* "clearly contemplated that plaintiff would resell defendant's stents" at a

given price and the lost profits from those lost sales constituted direct damages.

*Biotronik,* 11 N.E.3d at 682.

WEIL:\95683213\10\58399.0011

By contrast, here, the Credit Agreement does not contemplate that Spanish Broadcasting would be entitled to recover the EBITDA Damages or the Swap Damages now sought by Spanish Broadcasting. Those damages, as demonstrated by the facts alleged by Spanish Broadcasting and confirmed by the reports of Spanish Broadcasting's purported experts, do not "directly flow from the breach." Whether such damages were foreseeable to LCPI, as Spanish Broadcasting contends, has no impact on whether the damages are properly characterized as direct or consequential. *See* SBS Br. at 25 (arguing that "Lehman was well aware of the damages that Spanish Broadcasting would suffer if it breached the Credit Agreement); *PNC Bank,* 73 F. Supp. 3d at 374-375 (holding "the distinction between direct and consequential damages does not turn on the foreseeability of downstream damages," rather, "foreseeability serves as a limit on the extent to which consequential damages, when available, may be awarded.").[29]

    1.    The EBITDA Damages Are Consequential Damages that Have Been Waived by Spanish Broadcasting As a Matter of Law.

Spanish Broadcasting seeks $24.5 million in damages for the impact it claims that LCPI's failure to fund $10 million had on its EBITDA. *See* SBS Br. at 10. In support of the Claim, Spanish Broadcasting relies on the report of its

---

[29] Spanish Broadcasting argued in opposition to the Motion that the EBITDA Damages were direct damages because they are "diminution in value damages," citing cases and sources that are inapposite to the facts here. *See* Opp. Mem. at 31-33. The argument fails for the reasons set forth in the Plan Administrator's Reply Memorandum. *See* Reply Mem. at 25-28.

WEIL:\95683213\10\58399.0011

purported experts, Mr. Trautman and Mr. Kearns.[30]  Mr. Trautman concluded that

Spanish Broadcasting's inability to use $4 million of the funds[31] requested from

LCPI on advertising and marketing expenses was the "natural and probable

consequence" of Spanish Broadcasting's $13 million losses in 2010 as a result of

reduced audience ratings.  Trautman Report ¶¶ 5, 7.  Mr. Kearns expanded on Mr.

Trautman's conclusions and opined that the $13 million in alleged losses impacted

Spanish Broadcasting's EBITDA by $24.5 million, also arguing that these

damages "were the natural and probable consequence of Lehman's failure to fund

the Draw Request."  Kearns Report at 3, 8-11.

But, neither purported expert claims to be qualified to opine on what

constitutes a "natural and probable consequence" under contract law.  Nor do they

appear to have been advised of the conflicting and controlling case law.  Tellingly,

Mr. Trautman based his analysis on (1) advice he received from Spanish

Broadcasting's counsel that direct damages are "the natural and probable

consequence" of a breach of contract; (2) his "understanding" that the Revolving

Credit Facility "was intended for working capital purposes;" and (3) Spanish

---

[30] For purposes of the Motion only, the Plan Administrator did not dispute the facts or opinions asserted in the reports of Mr. Trautman or Mr. Kearns.  However, the Plan Administrator reserved its right to object to or otherwise challenge the designation and/or qualifications of Mr. Trautman and Mr. Kearns as expert witnesses, as well as the facts and opinions asserted in their reports.

[31] This component of the Claim is limited to $4 million of the $10 million that Spanish Broadcasting sought to borrow from LCPI because Spanish Broadcasting contends that it would have used the other $6 million to pay termination damages for the Swap.  *See* SBS Br. at 8.

WEIL:\95683213\10\58399.0011

Broadcasting's representation that it would have used $4 million of the $10 million requested of LCPI for marketing and promotional expenses. Trautman Report ¶¶ 4, 5. To say that these purported experts have begged the question is an understatement. They did not evaluate "the natural and probable consequence" of failing to loan money.

Furthermore, the details provided by Mr. Trautman regarding how LCPI's failure to loan Spanish Broadcasting $10 million allegedly caused its losses confirms that the EBITDA Damages are consequential, and not, direct damages. Mr. Trautman explains that LCPI's failure to loan Spanish Broadcasting $10 million left Spanish Broadcasting with a shortfall of $4 million in promotional spending, which resulted in:

- "limitations on the ability to adequately market/promote"

- which "would be expected to *eventually result in* declining ratings and brand awareness/identity"; and

- declining ratings and brand awareness/identity "*would in turn be expected to result in* poor advertising sales performance in relation to competing stations."

*Id.* ¶ 8 (emphasis added). According to Mr. Trautman, such limitations in promotional spending "would be expected to have increasing impacts in the time following the lack of promotion, since pre-existing audience affinity and awareness would naturally diminish as the amount of time since the last extensive promotional activity grew." *Id.* Thus, according to Spanish Broadcasting, LCPI's

WEIL:\95683213\10\58399.0011

failure to fund the Draw Request led to insufficient promotional spending which led to declining ratings and brand awareness, which led to poor advertising sales, which over time, impacted Spanish Broadcasting's bottom line. This collective downward spiraling of events confirms that the alleged losses are so attenuated that they cannot be "the natural and probable consequence" of LCPI's failure to fund.

The Court's recent decision in *Qube Films Ltd v. Padell*, 2016 WL 881128 (S.D.N.Y. March 1, 2016) is instructive. In *Qube Films,* the plaintiff, a production company, alleged that the defendant, an escrow agent, breached an escrow agreement by failing to properly disburse funds that would be used for the production of a movie. *Id.* at *1-3. The plaintiff sought to recover, in part, $250,000 in out-of-pocket expenses spent by plaintiff on the production of the movie, which "fell through" when plaintiff was unable "to secure other financing for the movie." *Id.* at *6. The defendant moved for summary judgment, arguing that those out-of-pocket expenses constituted consequential damages barred by a damages waiver in the escrow agreement. *Id.* The Court granted the defendant's motion holding that:

> [b]ecause out-of-pocket expenses invested in the failed [movie] project are "one step removed from the naked performance promised by the defendant" under the Escrow Agreement (namely, to disburse $900,000 under the terms of the agreement), they are properly categorized as consequential damages.

*Id.* (*quoting PNC Bank*, 73 F. Supp. 3d at 374).

WEIL:\95683213\10\58399.0011

Similarly, Spanish Broadcasting seeks damages it claims were incurred when it was allegedly unable to use $4 million of the $10 million it expected to receive from LCPI on marketing expenses. According to its purported experts, Spanish Broadcasting's inability to use $4 million on promotional spending led to a downward spiraling of events that impacted Spanish Broadcasting's bottom line. That downward spiraling is very far removed "from the naked performance promised by" LCPI under the Credit Agreement. As the Bankruptcy Court correctly concluded, LCPI did not agree to pay the EBITDA Damages pursuant to the Credit Agreement. Mem. at 17. Rather, LCPI agreed to make a loan of $10 million in exchange for repayment at a specified rate of interest.

Spanish Broadcasting's argument that it was "impossible" for Spanish Broadcasting to obtain alternative financing has no impact on the analysis. *See* SBS Br. at 29. The plaintiff in *Qube* similarly was unable to obtain alternative financing, but the court concluded that the out-of-pocket expenses were consequential damages as a matter of law. *See Qube Films,* 2016 WL 881128, at *6. Indeed, even if Spanish Broadcasting could show that replacement financing were unavailable, damages for losses other than the incremental cost of replacement financing constitute consequential damages. *See Avalon*, 175 N.E. at 653("[t]he utmost liability of a person who breaches his contract to loan money, in the absence of notice of *special* circumstances, is for the increased interest the

WEIL:\95683213\10\58399.0011

other person was obliged to pay.") (emphasis added); *Zelazny*, 244 N.Y.S.2d at 816 ("special damages which an inability to obtain the money under the peculiar circumstances of his case has actually caused [the plaintiff]" are recoverable as consequential damages).

Spanish Broadcasting's argument that section 4.16(b) of the Credit Agreement alters this analysis is wrong. The mere fact that section 4.16(b) provides that the proceeds from the Revolving Credit Facility would be used for "working capital purposes, capital needs and general corporate purposes" of Spanish Broadcasting does not transform consequential damages into direct damages. *See* SBS Br. at 27. Section 4.16(b) simply ensures that the funds will be used for business purposes. If Spanish Broadcasting were correct, then as long as the use of the funds complied with the terms of the Credit Agreement, no losses could ever constitute consequential damages. Given the parties included the Damages Waiver in the Credit Agreement, that cannot be a proper interpretation under the law. *See Luitpold Pharm.*, 784 F.3d at 87 ("In construing a contract, a court should . . . avoid any interpretation that would render a contractual provision without force and effect") (citation omitted); *Silverman v. Cent. Equities Credit Corp. (In re 18th Ave. Realty),* Case No. 03–14480(RDD), Adv. No. 07–01717(RDD), 2010 WL 1849403, at *6 (Bankr. S.D.N.Y. May 7, 2010) ("no provision of a contract should be left without force and effect.").

WEIL:\95683213\10\58399.0011

Spanish Broadcasting's reliance on *Coniber v. Center Point Transfer Station, Inc.*, 27 N.Y.S.3d 763 (App. Div. 2016) for the proposition that lost profits constitute direct damages is misguided.  As demonstrated above, *Coniber* conflicts with well-established case law holding that lost profits constitute direct damages *only* when they are expressly contemplated in the contract.  Further, the *Coniber* court did not evaluate whether the plaintiff's asserted damages were barred by a consequential damages waiver.  *See generally Coniber*, 27 N.Y.S.3d 763.  Rather, the court's focus was whether or not the asserted damages were too uncertain or speculative in nature to be recoverable.  *See Coniber,* 27 N.Y.S.3d at 766 (analyzing whether "the [lower] court's award of lost profits is supported by a fair interpretation of the evidence"); *Coniber v.Center Point Transfer Station,* No. 41453, 2015 WL 1471761, at *5 (N.Y. Sup. Ct. Mar. 23, 2015) (rejecting defendant's claim that plaintiff's claim for lost profits is speculative), *aff'd, Coniber,* 27 N.Y.S.3d 763.  Thus, *Coniber* has no relevance to this matter.

Accordingly, the evidence and supporting case law demonstrate that EBITDA Damages are consequential damages barred by the Damages Waiver as a matter of law.

      2.      The Swap Damages are Consequential Damages that Have Been Waived by Spanish Broadcasting As a Matter of Law.

The Swap Damages, as alleged by Spanish Broadcasting, arise from Spanish Broadcasting's claim that it could not afford to terminate the Swap it had entered

WEIL:\95683213\10\58399.0011

into with LBSF, an affiliate of LCPI.  In addition to alleged termination costs,

Spanish Broadcasting seeks "investment banker fees" and "estimated legal and

other costs," collectively amounting to $17 million.  Kearns Report at 13.  These

alleged damages do not flow directly from LCPI's failure to loan Spanish

Broadcasting its portion of the Draw Request.  Rather, they arise from a collateral

business arrangement between Spanish Broadcasting and LBSF, as well as separate

business arrangements between Spanish Broadcasting and an investment banker

and Spanish Broadcasting and an attorney.  Without any supporting factual

evidence, Spanish Broadcasting claims the Swap Damages are "manifestly not

from a collateral business arrangement" because LCPI "structured and facilitated

both the Credit Agreement and the related Swap," citing the declaration of its

Chief Financial Officer.  SBS Br. at 26.  But, there is no dispute that LBSF is a

separate legal entity from LCPI and the Swap was not incorporated into the Credit

Agreement.[32]  Spanish Broadcasting's conclusory assertions otherwise do not

create a material issue of fact.  *See Zappia Middle E. Const. Co. v. Emirate of Abu

Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000) ("The conclusory allegations in . . . [the]

---

[32] Spanish Broadcasting previously argued that the Credit Agreement required Spanish Broadcasting to enter into the Swap with LBSF.  Opp. Mem. at 33-34. Spanish Broadcasting is plain wrong.  Section 6.12 of the Credit Agreement required Spanish Broadcasting to enter into hedge agreements, to the extent necessary, but did not require the hedge agreement to be with LBSF.  See 7056-1 Stmt., Ex. C § § 6.12 (stating that Spanish Broadcasting will enter into "Hedge Agreements"); 1.1 (defining "Hedge Agreement" as an agreement between Spanish Broadcasting or its subsidiaries "providing for protection against fluctuations in interest rates or currency exchange rates or the exchange of nominal interest obligations" with no mention of LBSF or any other affiliate of LCPI).

WEIL:\95683213\10\58399.0011

affidavit are not sufficient to create a material issue of fact."); *JS ex rel. NS v. Attica Cent. Schools*, 386 F.3d 107, 110 (2d Cir. 2004) ("[W]e may not rely on conclusory or hearsay statements contained in . . . affidavits.") (citing *Zappia*); *Dorsey v. Artus,* No. 9:09-cv-1011 (GLS/DEP), 2013 WL 5463720, at *8 (N.D.N.Y. Sept. 30, 2013) (it is "true that conclusory, self-serving affidavits that are unsupported by any factual detail are insufficient to give rise to a dispute of material fact.").

Finally, Spanish Broadcasting's additional argument that the Bankruptcy Court erred by determining, on summary judgment, that Spanish Broadcasting could not show that "it had no alternative but to keep the Swap in place," fails. *See* SBS Br. at 28. First, the Bankruptcy Court's observation was not material to the court's ultimate decision that the Swap Damages are consequential damages arising from collateral business arrangements, and not from LCPI's breach of the Credit Agreement. Second, the Bankruptcy Court's conclusion was based on the undisputed fact that Spanish Broadcasting had sufficient funds to terminate the Swap at the time that LCPI failed to loan Spanish Broadcasting $10 million. *See* Oral Argument Tr. at 36:23-37:17 (Spanish Broadcasting admitting the "money was in the bank" but it was the CFO's judgment not to use the funds for that purpose); Mem. at 18-19. Indeed, the fact that it was Spanish Broadcasting's ultimate decision whether to use its available cash to terminate the Swap confirms

WEIL:\95683213\10\58399.0011

that the Swap Damages are not the "natural and probable consequence" of LCPI's failure to loan Spanish Broadcasting $10 million, and thus, that the Swap Damages are consequential damages barred by the Damages Waiver as a matter of law.

## CONCLUSION

For the foregoing reasons, the decision of the Bankruptcy Court granting summary judgment to the Plan Administrator should be affirmed.

Dated:      New York, New York
            May 17, 2016

                                        /s/ Ralph I. Miller
                                        Jacqueline Marcus
                                        Ralph I. Miller
                                        Denise Alvarez

                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        *Attorneys for Lehman Brothers
                                        Holdings Inc. and Certain of Its
                                        Affiliates*

WEIL:\95683213\10\58399.0011

## CERTIFICATE OF COMPLIANCE WITH RULE 8015(A)(7)(B)

This brief complies with the type-volume limitation of Rule 8015(a)(7)(B) because this brief contains 13,423 words, excluding the parts of the brief exempted by Rule 8015(a)(7)(B)(iii).

_____     Date: <u>May 17, 2016</u>
Signature

Print name of person signing certificate of compliance:

<u>Denise Alvarez</u>